## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | |
|---|---|
| **WILLIAM CAMPBELL,**<br>c/o Friedman, Gilbert + Gerhardstein<br>441 Vine Street, Suite 3400<br>Cincinnati, Ohio 45202, | Case No.<br><br>Judge |
| Plaintiff, | |
| -vs- | |
| **HAMILTON COUNTY, OHIO, and the**<br>**HAMILTON COUNTY BOARD OF**<br>**COMMISSIONERS,**<br>c/o Stephanie Summerow Dumas, President<br>138 East Court Street, Room 603<br>Cincinnati, OH 45202,<br><br>and | **COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |
| **BRIAN SHEPHERD (#23),**<br>**ROBERT S. VINER (#407),**<br>**THOMAS BUTLER,**<br>**JOHN DOES 1 THROUGH 10,**<br>1000 Sycamore Street<br>Cincinnati, Ohio 45202,<br><br>and | |
| **HAMILTON COUNTY DEPUTY CORONER**<br>**WILLIAM C. RALSTON,**<br>4477 Carver Woods Drive,<br>Blue Ash, Ohio 45242, | |
| Defendants. | |

Plaintiff William Campbell states as follows for his Complaint:

### INTRODUCTION

1.      This is a civil rights action. William Campbell was wrongfully convicted in 2009

for a crime he did not commit. He was unlawfully arrested, jailed, prosecuted, tried, and wrongfully

convicted for the death of Tina Hayes. Campbell was then imprisoned for over 11 years, despite his innocence.

2.     In 2020, a Hamilton County, Ohio trial court finally granted Campbell a new trial. He was acquitted on all charges, and was finally exonerated.

3.     Misconduct by Hamilton County Sheriff's Department deputies and a Deputy Coroner, along with those working in concert with them, caused—and continued—Campbell's wrongful conviction, in violation of his constitutional rights. These Defendants fabricated evidence against Mr. Campbell and suppressed exculpatory evidence, leading to the initiation of prosecution against him and to his conviction at trial.

4.     Campbell therefore brings this action under 42 U.S.C. § 1983 seeking redress for wrongs done to him, as well as to deter future misconduct.

## JURISDICTION AND VENUE

5.     This action arises under the laws of the United States, and jurisdiction is conferred on this Court under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights). Supplemental jurisdiction of the Court over the claims arising under state law is invoked under 28 U.S.C. § 1367 (supplemental jurisdiction).

6.     Venue in the Southern District of Ohio is proper under 28 U.S.C. § 1391(b), because it is the district in which many if not all of the defendants reside, and because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within this District.

## PARTIES

7.     Plaintiff **William Campbell** is a fifty-two-year-old man, residing in Indiana. At the time of his arrest in October 2008, he resided in Hamilton County, Ohio, and was thirty-eight years old.

8.      Defendant **Hamilton County** ("County") is an Ohio political subdivision, duly organized under the laws of the State of Ohio, residing in the Southern District of Ohio.  The Hamilton County Sheriff's Department ("HCSD") is an agency of Defendant County, and all actions of the HCSD are the legal responsibility of the County. Defendant County is a "person" under 42 U.S.C. § 1983. Defendant County is the employer and principal of the individual defendants, and is responsible for the policies, practices, and customs of the HCSD.

9.      Defendants HCSD **Corporal Brian Shepherd, #23** ("Shepherd"), **Corporal Robert S. Viner, #407** ("Viner"), **Lieutenant Thomas Butler** ("Butler), and **John Does 1 through 10** were, at all times relevant to the allegations made in this complaint, duly-appointed sheriff's deputies employed by the Hamilton County Sheriff's Department, acting within the scope of their employment for the Defendant County and the HSCO and under the color of state law. They are sued in their individual and official capacities.

10.     Defendant Hamilton County **Deputy Coroner William C. Ralston** was, at all times relevant to the allegations made in this complaint, a deputy coroner employed by Hamilton County, acting within the scope of his employment for the Defendant County and under the color of state law. He is sued in his individual capacity.

## FACTS

### Tina Hayes and William Campbell Are Involved in a Vehicle Crash

11.     This case arises from a single-car traffic accident on October 1, 2008, which resulted in the death of one person, Tina Hayes.

12.     Hayes and Campbell were in her Ford Explorer when it ran a stop sign, hit a raised embankment, went across an intersection into a yard, and struck two trees before crashing into a church.

13.     Hayes later died as a result of the crash.

3

14.     Hayes was the driver of the vehicle and Campbell was in the passenger seat at the time of these events.

15.     Defendant Corporal Robert Viner of the Hamilton County Sheriff's Department had been following the Explorer prior to the crash. Viner witnessed the crash and saw Campbell fly through the windshield of the vehicle.

16.     Defendant Viner was the first officer on the scene.

17.     Defendant Viner saw Campbell outside the vehicle, and found Hayes' body twisted against the passenger door. Hayes was unconscious when Viner found her.

18.     When Viner first saw Hayes, her body was oriented sideways, in a kneeling position, with her head facing toward the front of the vehicle and pinned between the right side of the passenger seat and the passenger's door.

19.     Defendant Viner asked Campbell who was driving and Campbell said "It wasn't me. Not me."

20.     The second officer on the scene, Deputy William J. Porzel, Jr. of the Hamilton County Sheriff's Department, approached Campbell and asked who was driving. Campbell told Porzel that it was not him.

21.     The vehicle was registered to Hayes.

22.     Firefighter/EMT Nicholas Placke arrived to find Hayes on the passenger side of the Explorer in a kneeling position. When Placke saw Hayes, she was not sitting. Instead, her body was oriented sideways in the vehicle, with her head against her chest and against the passenger door. Her head was angled forward toward the floor of the vehicle, with her face pointed toward the front of the vehicle.

23. Placke and another EMT rendered aid, removed Hayes from the car, and transported her to the hospital. At the hospital, Hayes was declared deceased.

24. Local media arrived at the scene about thirty to forty minutes after the accident.

25. Mark Slaughter, a videographer from WCPO Channel 9, shot footage of the accident on October 1, 2008. He estimated he arrived at the scene between 12:15 and 12:30 am.

26. Defendant Corporal Brian Shepherd of the Hamilton County Sheriff's Department subsequently arrived on the scene at 12:23 a.m. to perform work as an alleged expert in accident reconstruction.

27. Defendant Shepherd photographed the scene, took measurements, interviewed Defendant Viner, and developed a theory of how the crash occurred and who was driving.

28. Defendant Viner gave a written statement to Defendant Shepherd, in which Viner falsely stated that Hates was "*seated* in the front passenger's seat." (Emphasis added).

29. Defendant Shepherd falsely reported in an initial report that Hayes was "positioned in the front passenger seat in a *seated* position, with her upper torso leaned towards the floor board." (Emphasis added).

30. Defendant Shepherd also falsely reported these events, stating that Campbell was the driver and Hayes was the passenger.

31. Defendant Shepherd further falsely reported in his written analysis of the crash, among other falsified facts, that Hayes left hair particles (plural) on the A post and that her left knee struck the glove box handle, producing a knee bolt imprint on the glove box, and that Hayes had a visible injury to her left knee which showed the outline of the glove box handle.

32.     Defendant Shepherd also falsely reported in his written analysis of the crash various facts, measurements, and causes of damage to the vehicle and surrounding structures and objects at the time of impact.

33.     After the crash, a set of keys to the Explorer were found in the ignition, and a second set of keys was found in the shorts Campbell was wearing on the night in question. One of the keys with Campbell's set matched the one in the ignition.

34.     Hayes was pronounced dead at the hospital at 12:18 a.m. on October 2, 2008.

35.     Later on the night of the crash, Defendant Shepherd took photographs of Hayes' body at the hospital.

36.     These photographs depicted various injuries to Hayes, including injuries to the left side of her chest, neck, and shoulder.

37.     Defendant Hamilton County Deputy Coroner William C. Ralston later performed the autopsy on Hayes.

38.     Photographs taken during Ralston's autopsy likewise showed bruising to the left side of Hayes' chest, shoulder, and neck, which were consistent with Hayes' position as driver.

39.     However, Defendant Ralston omitted these injuries from the autopsy report and, upon information and belief, from his notes.

40.     Defendants Shepherd, Viner, and Ralston all fabricated evidence that supported the conclusion that Hayes was the passenger and Campbell was the driver, including but not limited to evidence in official reports, statements, notes, and other documents.

**Wrongful Arrest and Prosecution of William Campbell**

41.     Despite clear indications that he was the passenger and that Hayes was the driver, which were known to Defendants, William Campbell was arrested and charged for the death of Tina Hayes.

42.     On October 2, 2008, Defendant Shepherd filed an affidavit and complaint alleging Campbell committed the offense of aggravated vehicle homicide in violation of R.C. 2903.06, a felony of the second degree.

43.     Defendant Shepherd's affidavit and complaint reflected and were based upon evidence fabricated by Viner and Shepherd.

44.     Viner's and Shepherd's false, fabricated, and unreliable evidence was used to initiate prosecution against Campbell.

45.     Viner and Shepherd made, influenced, or participated in the decision to prosecute Campbell.

46.     Defendant Shepherd's affidavit alleged that Campbell operated the vehicle in which he and a "front seat passenger" traveled at a high rate of speed, and that Campbell "failed to maintain control of his vehicle," the "vehicle traveled through the intersection of adams road [sic], where it then exited the roadway," and that the vehicle "then struck a pine tree," "then traveled through the pine tree and then struck the northwest corner of the northview wessleyan church [sic]." Defendant Shepherd referred to the vehicle throughout his affidavit as "Campbell's [sic] vehicle."

47.     Defendant Shepherd's affidavit further alleged that "as a result of the crash, the front seat passenger in Campbell's [sic] vehicle sustained fatal injuries and was pronounced dead upon arrival to the hospital," and that "at the time, Campbell [sic] was operating under a suspended license."

48.     Allegations contained in Defendant Shepherd's affidavit were false.

49.     By filing this affidavit and complaint, Defendant Shepherd initiated prosecution against Campbell for the death of Tina Hayes.

50.     Defendant Shepherd also filed a warrant for Campbell's arrest on October 2, 2008.

51.     There was no probable cause to arrest or prosecute William Campbell.

52.     On or about October 4, 2008, Campbell held in custody at the Hamilton County Justice Center in Cincinnati, Ohio.

53.     The case was subsequently presented to the grand jury.

54.     On October 14, 2008, an indictment was filed charging Campbell with six felonies that he did not commit.

55.     Upon information and belief, the indictment resulted from Shepherd's, Viner's, and/or John Does' misrepresentations, in which those deputies knew or should have known that the information they presented to the Grand Jury was false.

56.     The criminal action proceeded as Hamilton County Court of Common Pleas Case No. B 0808031.

57.     On October 14, 2008, an indictment was filed charging Campbell with six felonies. After an amended indictment was filed on October 21, 2009, Campbell faced trial for three counts of aggravated vehicular homicide, two counts of operating vehicle under the influence of alcohol (OVI), and failure to comply with order or signal of police officer.

58.     On or about October 24, 2008, Campbell pled not guilty to the charges.

59.     The charges filed in Shepherd's complaint, and later in the indictment and amended indictment, related to the single-car accident taking place on or about October 1, 2008, which resulted in the death of Tina Hayes.

60.     As the prosecution moved forward, Campbell rejected plea offers, asserting his innocence.

**Defendants Offer Fabricated Evidence at Trial, Leading to Campbell's Conviction**

61.     The State of Ohio proceeded to trial on Shepherd's fabricated theory that Campbell drove the vehicle during the accident, and relied upon Shepherd's, Viner's and Ralston's fabricated evidence to prosecute the case.

62.     The first trial began in June 2009 and ended with a mistrial.

63.     On October 13, 2009, a second trial commenced.

64.     The second trial was rife with fabricated evidence offered by Defendants Shepherd, Viner, and Ralston.

65.     The State relied upon these Defendants' false, fabricated, and unreliable evidence in closing arguments.

66.     Defendants' false, fabricated, and unreliable evidence influenced the jury and caused Campbell's conviction.

67.     For example, though photos from the crime scene showed that the rearview mirror was attached to the windshield after the accident, Defendant Viner falsely testified that he saw a rearview mirror on the ground in the area where Campbell was found.

68.     Defendant Shepherd falsely testified that the location of the mirror could be forced out by an object that's going through windshield.

69.     The prosecution emphasized this evidence during its opening and closing arguments to the jury to place Campbell in the driver's seat.

70.     As an additional example, though Hayes actually wore a black jacket and Defendant Shepherd himself took photos illustrating this fact, Shepherd testified repeatedly Hayes wore a blue sweater on the night at issue, while Campbell wore a black shirt.

71.     Defendant Shepherd went so far as to falsely testify that the sweater was taken by the coroner and tested, when in fact the sweater was never tested by the Coroner's Office.

72.     The prosecution relied upon this evidence in closing argument, saying the jurors would see a "navy blue sweater" worn by Hayes that was consistent with the fibers removed from the door.

73.     Further, Defendant Shepherd falsely testified repeatedly that Hayes had a knee injury, which he claimed was caused by her hitting the passenger side glove compartment. Shepherd also falsely testified Hayes had no steering wheel injuries or marks.

74.     However, photos of Hayes in the hospital taken by Defendant Shepherd himself showed injuries to the left side of her chest, neck, and shoulder.

75.     Defendant Shepherd likewise falsely testified that Campbell had no knee injuries—despite the reality that Campbell did, in fact, have knee injuries—in support of his fabricated conclusion that Campbell was the driver and would have had knee injuries from the glove box if he had been the passenger.

76.     Shepherd testified falsely that one of the reasons Hayes was excluded as a driver was because she did not have any physical injuries in relation to the steering wheel being bent, and that Campbell did not have any knee injury produced by the glove box.

77.     The State relied upon Shepherd's false testimony to support the contention Ms. Hayes was the passenger, the key issue in this case.

78.     Further, HCSD crime scene evidence technician, John Mulholland, testified that on October 2, 2008, one day after the accident, he processed the vehicle at issue, looking for blood, hairs, and fibers. Mulholland testified that he located blood transfers on the passenger seat. Mulholland never testified, however, as to finding blood on the glove compartment faceplate. Reports generated by Mulholland show that on October 2, 2008, he did not submit the glove box faceplate to the lab for testing.

79.    During Defendant Shepherd's investigation on October 2, 2008, his report establishes that he never observed blood on the glove box faceplate and photos taken of the faceplate reveal no blood present.

80.    Yet, on October 3, 2008, one day after Mulholland processed the vehicle and Shepherd observed the vehicle, Defendant Shepherd pried the glove compartment faceplate off. Shepherd laid the glove box faceplate down in the vehicle along with other pieces of evidence scattered about, and among blood stains in the vehicle from the crash.

81.    In doing this, Shepherd fabricated blood evidence on the glove box faceplate.

82.    The faceplate was not submitted into evidence until October 29, 2008, well after it was processed by Mulholland and the faceplate had been removed by Defendant Shepherd, and certainly well after Mulholland submitted other related evidence to the laboratory.

83.    It was at this time that Michael Trimpe, a forensic scientist from the Coroner's Office, observed a reddish brown stain on the faceplate, about which he testified at trial.

84.    Shepherd falsely testified that the glove box had been damaged by Hayes' knee, despite the fact that Shepherd himself created the dent to the glove box faceplate when he used a crowbar to remove it.

85.    Defendant Viner also falsely testified that he looked in the driver's side window—without even opening the door—and observed a pair of shoes on the driver's side of the vehicle, and saw Campbell was not wearing any shoes.

86.    Defendant Shepherd also falsely testified that when he arrived at the scene and first came upon the driver's side door, he opened the door and took a picture depicting male shoes in the driver's side of the vehicle.

87.     But Shepherd arrived at the scene at 12:23 a.m., and news footage obtained between 12:15 a.m. and 12:30 a.m. did not show these shoes in the vehicle.

88.     Further, Shepherd's photographs, as well as photographs from the impound lot, establish that it would have been impossible for Viner to see shoes in the driver's side of the vehicle, where Viner claimed to view the shoes, without opening the door.

89.     The State relied upon this fabricated evidence in closing argument, stating that because Campbell's tennis shoes were allegedly found on the driver's side of the vehicle, Campbell had to be the driver since Campbell was not observed wearing any shoes at the scene of the accident.

90.     Defendant Shepherd testified that Hayes' body's position was critical to the State's case, and testified that by the time he arrived at the scene, Hayes had already been transported to the hospital.

91.     Defendant Shepherd testified he had to rely on other deputies to make a determination of the body's position.

92.     Viner's falsified report formed the basis of Shepherd's fabricated testimony concerning Hayes' body position.

93.     Defendant Viner had previously a written statement to Defendant Shepherd, in which Viner falsely stated that Hayes was "*seated* in the front passenger's seat."

94.     But Viner also reported that observed that Hayes was trapped between the right side of the passenger seat and the passenger door.

95.     Shepherd embellished further on Viner's false report about Hayes being seated and about her injuries in his own reports and testimony.

12

96.     At trial, Shepherd testified using a reenactment photo showing a woman deputy *sitting up* in the passenger seat, falsely depicting Hayes' position and falsely suggesting that Hayes' head injury came from the A-post of the vehicle.

97.     However, Shepherd's own investigative report likewise reveals Shepherd's fabricated evidence, and states that Hayes' upper torso was observed leaning towards the floor board, and that Hayes' head was pinned between the passenger seat and the passenger door.

98.     Defendant Shepherd also falsely testified that several strands of the Hayes' hair were found on the passenger's A-post, and this played a significant role in Shepherd's investigation.

99.     Yet Michael Trimpe, a forensic scientist at the Hamilton County Coroner's Office Crime Laboratory, testified he tested several hairs from the passenger side window frame and found a single hair belonging to Hayes.

100.    Shepherd, the State's key witness, misrepresented the evidence in his attempt to place Hayes in the passenger seat of the vehicle.

101.    The prosecution pointed Shepherd's falsified evidence about Hayes' hair on the passenger A-post during closing statements to the jury.

102.    Defendant Shepherd also gave false, misleading, and mathematically impossible testimony at trial about the circumstances of the accident.

103.    Shepherd's false testimony reflected the evidence that Shepherd had earlier fabricated in support of prosecution of Campbell.

104.    Shepherd's falsified evidence included, but is not limited to false testimony that: the vehicle started rotating around left to right and that as the vehicle disengaged from the wall after the initial impact, the vehicle went into a counterclockwise rotation upon the disengagement

from the building; during the course of the accident, the driver—whom he said was Campbell—went toward the passenger side A post of the vehicle, and that anything going out the windshield would show direction, including the rear-view mirror which he falsely represented as having gone out the windshield even though, in reality, it was still attached to the vehicle.

105.    Shepherd's own LTI map established his false testimony, as it showed the vehicle crossed the sidewalk in front of the church on one step, as opposed to straddling two steps as Shepherd claimed.

106.    Defendant Dr. Ralston, who performed the autopsy on Hayes, also testified at trial.

107.    Ralston testified Hayes died from a cervical spine fracture due to blunt force trauma, due to a motor vehicle collision.

108.    Defendant Ralston testified based on his notes and his autopsy report.

109.    Ralston testified, per his notes and the autopsy report, that during the autopsy, he observed a six-inch laceration on the left side of Hayes' head, a laceration on her back right posterior scalp measuring four inches, a superficial abrasion below her lower lip, a blue contusion or bruise and abrasion on the right clavicular chest near the collarbone, abrasions on the right wrist and right forearm, a superficial abrasion on the left knee, and a contusion on the left knee.

110.    However, Defendant Ralston also falsely testified to Hayes' injuries as including only those injuries. Ralston's testimony, his autopsy report, and, upon information and belief, his notes, omitted the injuries to the left side of Hayes' chest, neck, and shoulder.

111.    This omission by Ralston constituted fabricated evidence concerning the absence of injuries to Hayes' left chest, neck, and shoulder.

112.    Yet Ralston testified that drivers oftentimes will have circular abrasions consistent with steering wheels and other injuries, including injuries or abrasions to the left side of the body.

113.    Other witnesses testified at trial, as well.

114.    Lieutenant Thomas Butler of the Hamilton County Sheriff's Department, the night watch shift commander, testified he arrived at the crash scene within minutes after the accident. He stated the local media arrived at the scene about thirty to forty minutes after the accident. Butler testified when he observed Campbell, Campbell was laying to the right front side of the vehicle.

115.    Dr. Malcom Baxter testified that Campbell had injuries to his face, eye, and leg, and did not have injuries to his chest, nor any surface bruising.

116.    Joan Dawson Burke, a serologist with the Hamilton County Coroner's Department, testified the blood found on the passenger's side airbag belonged to Campbell. She also indicated no blood was visible on the driver's side air bag.

117.    John Mulholland, the crime scene investigator from the Hamilton County Sheriff's Department, testified he collected hairs and blood from the vehicle and submitted them to the laboratory.

118.    Michael Trimpe, a forensic scientist at the Hamilton County Coroner's Office Crime Laboratory, testified he tested several hairs from the passenger side window frame and found a single hair belonging to Hayes. He had no explanation for how long the hairs that matched Hayes had been inside the vehicle.

119.    Trimpe also testified that he collected a plastic armrest from the vehicle and was told to look for dark fibers because Hayes had been wearing a dark sweater. Trimpe indicated he found several blue cotton fibers. He admitted, however, being unable to match the dark fibers to Hayes' clothing because such clothing was no longer available.

120.    Contrary to Shepherd's false claims, Trimpe acknowledged that it appeared the fibers had been in the armrest for a long period of time because they were fused into the armrest.

121. Pamela Holt, the mother of Hayes, testified that two days after the accident on October 3, 2008, she went to the Sheriff's office to retrieve a camera from the wreckage. Holt frequently rode in her daughter's vehicle, and noted Hayes always kept the driver's seat pulled forward to enable her to reach the accelerator and brake pedals. Holt testified that when she viewed the vehicle on October 3, 2008, the driver's seat was in the *usual forward position*. Holt stated the passenger seat of the vehicle was pushed to the back.

122. Holt also testified that while she was at the Sheriff's office, Defendant Shepherd used a crowbar to pry the glove box open to help search for property belonging to her daughter. Holt testified that the glove box was not dented prior to Shepherd prying it off.

123. At the conclusion of trial, the jury had heard multiple iterations of fabricated evidence from Shepherd, Viner, and Ralston.

124. Shepherd, Viner, and Ralston knowingly fabricated this evidence against Campbell.

125. In prosecuting this case and at the conclusion of trial in closing arguments, the State relied upon the falsified evidence that Defendants Shepherd, Viner, and Ralston offered in support of the prosecution of Campbell.

126. There is a reasonable likelihood that the false evidence offered by Shepherd, Viner, and Ralston affected the judgment of the jury.

127. Had it not been for the fabricated evidence by Shepherd, Viner, and Ralston, the outcome of trial would have been different and Campbell would not have been convicted.

128. Upon information and belief, Defendants suppressed additional reports, statements, notes, photographs, pictures, other documents or recordings, and/or information which were exculpatory for Campbell, which were not provided to Defendant or his counsel before, during, or after trial, and which deprived Campbell and his counsel of the opportunity to investigate,

challenge, impeach or otherwise question Defendants and other witnesses about the inconsistent evidence and information.

## Campbell Is Wrongfully Convicted and Sentenced

129.    At the conclusion of the second trial, after hearing the fabricated evidence from Defendants Shepherd, Viner, and Ralston, the jury convicted Campbell of three counts of aggravated vehicular homicide and the two counts of OVI.

130.    At the sentencing hearing held November 24, 2009, Judge Ralph E. Winkler of the Hamilton County Court of Common Pleas merged two of the aggravated vehicular homicide counts, and separately merged two of the OVI counts. Judge Winkler subsequently imposed a term of imprisonment in a state correctional institution as follows: 15 years for aggravated vehicular homicide (which is contrary to R.C. 2903.06(A)(1)(a) as a felony of first degree); 5 years for OVI contrary to R.C. 4511.19(A)(1)(a) as a felony of the third degree; and 8 years for aggravated vehicular homicide contrary to R.C. 2903.06(A)(2)(a) as a felony of the second degree. Judge Winkler ran each sentence consecutive to one another for an aggregate prison sentence of 28 years.

131.    Despite this conviction and sentencing, Campbell did not commit the charged offenses or any lesser-included offenses. He was and is completely innocent of the charges that were brought against him and of which he was convicted.

## Campbell Fights for His Exoneration

132.    After he was convicted, Campbell did not give up. He continued to fight to prove his innocence and to clear his name.

133.    Campbell maintained his innocence before, during, and in the decades following his conviction.

134.    Following his conviction, Campbell continually sought appellate, post-conviction, and habeas relief from his conviction and sentence. *State v. Campbell*, No. C- 090875 (Ohio 1st

Dist. Mar. 4, 2011); *State v. Campbell*, 128 Ohio St.3d 1558, 2011-Ohio-2905, 949 N.E.2d 44; *State v. Campbell*, 2011-Ohio-3784, 2011 Ohio App. LEXIS 3222 (1st Dist.); *State v. Campbell*, No. C-120016 (Ohio 1st Dist. June 29, 2012); *State v. Campbell*, 2012-Ohio- 4650, 975 N.E.2d 1031; Entry Granting Application for Reopening, *State v. Campbell*, No. C- 090875 (1st Dist. Feb. 27, 2012); Entry Overruling Motion to Supplement the Application to Reopen Filed on November 28, 2011 and January 20, 2012, *State v. Campbell*, No. C-090875 (1st Dist. Feb. 27, 2012); *State v. Campbell*, 132 Ohio St.3d 1411, 2012-Ohio-2454, 968 N.E.2d 493; *Campbell v. Warden*, No. 1:14-cv-13 (S.D. Ohio), Habeas Petition (R. 1).

135.    At each instance, with one exception, Campbell was denied relief.

136.    Until 2020, the only appellate or post-conviction relief Campbell obtained was to have his prison sentence reduced from 28 to 20 years. *State v. Campbell*, 2012-Ohio-4231, 978 N.E.2d 970, ¶ 14, 16 (1st Dist.); *State v. Campbell*, 2013-Ohio-347, 982 N.E.2d 729; *State v. Campbell*, 1st. Dist. Hamilton No. C-130251 (1st Dist. May 16, 2014); *State v. Campbell*, 140 Ohio St.3d 1441, 2014-Ohio-4160, 16 N.E.3d 683.

137.    On February 22, 2017, Campbell filed a Motion for Leave to File Motion for New Trial ("Motion for Leave") in the Hamilton County Court of Common Pleas.

138.    In this Motion for Leave, Campbell cited: a new report from an accident reconstruction expert definitely concluding Campbell was not the driver; a violation of his rights under *Brady v. Maryland*, 373 U.S. 83 (1963) because the State of Ohio failed to disclose autopsy photographs prior to trial; further support of innocence based on original, digital photographs of the State's exhibits submitted at trial; and a violation of his right to the effective assistance of trial counsel as guaranteed by the Sixth Amendment to the United States Constitution.

139.    On November 9, 2017, Judge Charles J. Kubicki, Jr. of the Hamilton County Court of Common Pleas denied the Motion for Leave.

140.    Campbell appealed and on May 17, 2019, the Ohio Court of Appeals for the First Appellate District ("First District") reversed, concluding Judge Kubicki erred in denying Campbell an evidentiary hearing to evaluate his new-trial claims in light of new evidence. *State v. Campbell*, 1st Dist. Hamilton No. C-170666, 2019-Ohio-3142.

141.    Following the First District's decision, the matter was reassigned to Judge Jody M. Luebbers of the Hamilton County Court of Common Pleas.

**Campbell Is Finally Permitted to Present New Evidence to the Trial Court
and Is Exonerated**

142.    On February 6, 2020, Judge Luebbers granted Campbell's Motion for Leave and ordered Campbell to separately file his Motion for New Trial. On February 10, 2020, Campbell filed a Motion for New Trial.

143.    The Motion for New Trial detailed newly discovered evidence in the case.

144.    The Motion for New Trial's newly discovered evidence included expert evidence, including but not limited to:

   a.    Expert evidence concerning the circumstances of the crash, offered in the form of testimony from expert Jack Holland, a retired Ohio State Highway Patrolman and an accident reconstruction expert, who reviewed Defendant Shepherd's report and trial testimony, among other documents, and visited the crash scene;

      i.    Holland opined that Shepherd's trial testimony contained numerous seriously flawed analyses of the physical evidence and the physical forces acting on the vehicle and its occupants, including regarding the principal direction of force, kinematics, the time for the occupants to travel across the

19

        sidewalk into the brick wall, the impact, the injuries to Hayes, the absence of certain injuries to Campbell, and the rotation of the vehicle;

    ii.  Holland also determined that the hood of the vehicle did not come in contact with the window on the south side of the church wall as Shepherd had testified;

    iii.  Holland further concluded that Campbell was not the driver, which was supported by Viner's description of Campbell being ejected from the vehicle simultaneously with the vehicle impact;

  b.  Expert evidence concerning the circumstances of the crash, offered in the form of expert testimony from accident reconstruction expert, Jen Hickok, a joint expert of the defense and the State, who concluded that Tina Hayes was driving and William Campbell was the passenger.

145.    The Motion for New Trial also cited to the State's failure to provide (1) autopsy photographs, and (2) time-stamped photographs taken from the scene of the accident, which were later obtained by Campbell through discovery in his federal habeas case.

146.    The autopsy photos demonstrated that Defendants Shepherd and Ralston falsified evidence against Campbell:

  a.  The autopsy photos taken during Ralston's autopsy of Hayes show that she had bruising to the left side of her chest, shoulder, and neck, which were not documented in reports nor testified to by Ralston or Shepherd;

  b.  Defendant Shepherd testified at trial that the steering wheel was bent, and as Campbell had no injuries to his chest, these unreported injuries to Hayes' chest would have shown that she was the driver;

c. Defendant Ralston also failed to take a photo of Ms. Hayes' entire front side, including of her knees, thereby precluding the preservation of evidence of other injuries, despite it being unusual for a coroner to not photograph the entire body of the deceased.

147. The time-stamped crash scene photos also established that Defendants Shepherd and Viner falsified evidence against Campbell:

a. Defendants Viner and Shepherd both testified that they saw men's shoes in the driver side of the vehicle, and these shoes were documented in photos taken by Defendant Shepherd at 12:34 a.m.;

b. However, the time-stamped media photos, taken between 12:15 and 12:30 a.m. revealed that there were no shoes in the vehicle at that time of the media photos, which were taken prior to Shepherd's photos.

148. Further, digital copies of the crash scene photos produced by the Warden during Campbell's habeas litigation also revealed details that were unavailable at trial and which establish fabrication by Defendant Shepherd:

a. These digital copies provided clearer images than the photo exhibits presented at trial;

b. For example, these digital copies show the air conditioning unit and the wood on the left side of the unit still intact;

c. Thus, these digital copies prove that the unit was not hit by the hood of the vehicle as Defendant Shepherd claimed;

    d.   Further, digital copies of the photos also show that the two frame rails where the vehicle's frame rails hit and penetrated the church wall, which was to the right of the window;

    e.   Thus, these digital copies establish that the vehicle was not elevated on the driver's side at impact as Defendant Shepherd claimed, and also therefore establish that Campbell could not have been ejected at impact as the passenger or he would have impacted the wall and been killed, and instead, Campbell, the passenger, had room to be—and was—ejected.

149.   In addition to the crash scene and autopsy photos, the Warden provided Campbell every photo in the Warden's possession during the habeas litigation.

150.   These photos produced by the Warden, which were previously unavailable to Campbell, include photos allegedly taken by Shepherd.

151.   These photos produced by the Warden also establish fabrication by Shepherd, Viner, and Ralston:

    a.   These photos included images of Hayes taken while she was still at the hospital;

    b.   One of these original images also shows bruising to the left side of Ms. Hayes's chest;

    c.   This bruising was consistent with Hayes hitting the steering wheel and being the driver;

    d.   One of these original images also shows the right side of Hayes's face covered in blood;

e.  This blood on Hayes' face is consistent with the pool of blood found on the passenger seat and the description of Hayes kneeling, and leaning down and forward in the seat;

f.  This blood on Hayes' face shows that Viner's and Shepherd's claims that Hayes was sitting up in the passenger seat, including Shepherd's use of and testimony about the reenactment photo with a deputy sitting up in the passenger seat, involved fabricated claims;

g.  Further, the photos also depict Hayes' knees, in photos that were taken while she was still at the hospital;

h.  These photos show that the imprint to both of Hayes' knees was caused by the straps attached to the medical board, and was not caused by the glove box faceplate handle as Defendant Shepherd claimed;

i.  Further, the photos of Hayes at the hospital clearly show a large gash on Ms. Hayes' left knee;

j.  This gash would have left a smear on the glove box faceplate had she been sitting there as Viner and Shepherd claimed;

k.  However, the photos also showed that there was no bloodstain on the glove box faceplate when the photos were taken, at the time the glove box was still attached and not yet removed by Shepherd from the vehicle with the crowbar;

l.  The photos also showed that Hayes had a black jacket, and not dark blue clothing, as Shepherd and Viner claimed.

152.  These newly-produced photos also included other photos taken by HCSO Detective Mulholland, which were previously unavailable to Campbell.

23

153.    Mulholland's photos also established fabrication by Shepherd and Viner:

a.    Mulholland testified that he processed the scene on October 2, 2008;

b.    However, photos produced by the Warden in the "impound det. mulholland" folder include metadata reflecting a creation date of October 5, 2008;

c.    These photos reflect certain aspects of the vehicle as being undisturbed at the time of photographing, including, e.g., the glove box faceplate and airbags still intact, the keys still in the ignition, and the front bumper intact, while photos taken by Shepherd allegedly on October 3, 2008 depict the airbags, keys, and front bumper removed.

154.    On February 12, 2020, Judge Luebbers granted Campbell's Motion for New Trial; the entry journalizing the decision was filed on February 14, 2020. Judge Luebbers also set Campbell's bond as own recognizance, resulting in his release from custody. He remained under indictment.

155.    On June 4, 2020, a bench trial commenced before Judge Luebbers.

156.    At the conclusion of trial on June 4, 2020, Judge Luebbers found Campbell not guilty of all charges; the entries journalizing the trial court's decision were filed on June 17, 2020.

157.    Finally, after years of fighting, at the conclusion of this 2020 trial, William Campbell was exonerated for death of Tina Hayes.

158.    The new evidence that led to Campbell's exoneration revealed exculpatory information that was known to Defendants before, during, and after the trial and retrial of William Campbell, and not known to Campbell or his counsel before, during, or after trial.

159.    This critical exculpatory information was suppressed by Defendants before, during, and after trial.

160.    Because this exculpatory information was withheld from Campbell and his defense counsel, defense counsel were not able to investigate, challenge, impeach or otherwise question Defendants and other witnesses about the inconsistent evidence and information.

### Butler and Other Supervisors Were Aware of, Condoned, and Ratified the Misconduct of Shepherd and Viner

161.    Defendant Butler and/or other supervisors were aware of, condoned, and ratified Defendants Shepherd's and Viner's misconduct throughout this case.

162.    On October 1, 2008, Defendant Lieutenant Thomas Butler was the night watch commander, overseeing all four districts in which HCSD deputies patrolled.

163.    Butler had years of experience and training as an accident reconstructionist.

164.    Defendant Butler was called to the scene by Viner. Butler also called Shepherd to the scene.

165.    At the scene, Defendant Butler was responsible for obtaining statements. He remained at the scene throughout the entire course of the investigation.

166.    Butler had an opportunity to look at the scene and analyze it.

167.    Butler observed Hayes in the vehicle at the scene.

168.    Butler was also present with Defendant Shepherd when he photographed Hayes at the hospital.

169.    Yet Butler took no action in relation to Shepherd's and Viner's fabrication of evidence.

170.    Butler was aware of, condoned, and ratified the misconduct of Defendants Shepherd and Viner, having taken no corrective action, and instituting no review or discipline through the chain of command or any other avenue.

171.    Defendant Butler's approval of the misconduct of Defendants Shepherd and Viner was carried out in compliance with HCSD's policies, practices and customs in force at the time.

172.    Likewise, upon information and belief, other supervisors in the HCSD, including but not limited to the Sheriff, were aware of, condoned, and ratified the misconduct of Defendants Shepherd and Viner, having taken no corrective action, and instituting no review or discipline through the chain of command or any other avenue.

173.    These supervisors' approval of the misconduct of Defendants Shepherd and Viner was carried out in compliance with HCSD's policies, practices and customs in force at the time.

**Defendants' Coordinated Efforts**

174.    Each of the Defendants were aware of the other Defendants' misconduct and knew or should have known that William Campbell was not the driver of the vehicle.

175.    Defendants' conduct involved suppression, fabrication, and otherwise unconstitutional conduct concerning material evidence, and was unduly prejudicial in the case against Campbell.

176.    The Defendants were aware of each other's misconduct in fabricating and suppressing evidence for and at trial, and their other unconstitutional conduct as described in this Complaint.

177.    Upon information and belief, the Defendants suppressed and destroyed additional evidence still unknown to Plaintiff, which would have shown Campbell's innocence.

178.    The Defendants upheld a "code of silence" in which they did not disclose the misconduct alleged herein—among other known and unknown misconduct—in order to protect each other and ensure they could continue to engage in their egregious behavior with impunity.

179.    Campbell was taken into custody without probable cause and jailed for months and then imprisoned for years.

180. The Defendants ignored evidence of Campbell's innocence and instigated, influenced, or participated in the prosecution of Campbell despite lacking probable cause and instead being aware of or knowing that there was evidence indicating his innocence.

181. Defendants' suppressed material, exculpatory information from the defense at trial, in violation of Campbell's rights under the Fourteenth Amendment to the United States Constitution.

182. But for Defendants' misconduct, there is a reasonable likelihood the jury would not have found Campbell guilty at trial.

183. Defendants knew and/or should have known that testimony offered in support of Campbell's conviction was false, but failed to correct such testimony or to disclose such information to Campbell or his counsel.

184. There is a reasonable likelihood that the false testimony offered in Campbell's trial affected the judgment of the jury.

185. In addition to the affirmative misconduct described in this Complaint, the Defendants willfully ignored and acted to undermine evidence that showed conclusively that Campbell was not the driver.

186. The Defendants' misconduct continued even after Campbell was convicted and during the time he was pursuing appellate and post-conviction relief.

187. Defendants' conduct as described in this Complaint caused extreme prejudice to Campbell in the criminal proceedings at issue here.

188. Campbell was deprived of the opportunity to investigate the people and information suppressed before, during, and after trial, and of the opportunity to impeach evidence and testimony offered at trial.

189.    Upon information and belief, prior to and/or during trial, Defendants and other HCSD deputies had knowledge that Campbell was innocent, and that Hayes was the driver.

190.    None of the Defendants nor any other HCSD deputy informed Campbell or his counsel of their knowledge of Hayes as the driver or of Campbell's innocence before, during, or after trial.

191.    Defendants' failures to disclose the exculpatory information described in this complaint deprived Campbell of his right to a fair trial.

### Defendant Hamilton County's Policies and Practices

192.    Upon information and belief, Defendants were never investigated nor disciplined for their conduct described in this Complaint—including ongoing misconduct before, during, and after Campbell's trial, and the pendency of Campbell's various post-conviction motions—even though their misconduct was obvious and/or known to other HCSD deputies and supervisors.

193.    The misconduct described in this Complaint was undertaken pursuant to the policies and practices of the Defendant County and the HCSD in that Hamilton County deputies regularly used unconstitutional measures to falsely implicate criminal suspects, including by fabricating evidence and/or withholding and/or suppressing exculpatory evidence. These were widespread, clear, and persistent patterns and practices of the deputies in the HCSD and were established before the prosecution of William Campbell.

194.    The widespread nature of these practices and policies are apparent in the commission of these constitutional violations by multiple supervisory officers, including Shepherd and Viner, who were both corporals, and Butler, who was a lieutenant, along with the knowledge and/or participation of John Does 1 through 10, who were deputies and/or supervisors.

195.    These widespread practices were so historically evident and well-settled as to constitute *de facto* policy in the Hamilton County Sheriff's Department, and it was allowed to exist

because municipal policymakers with authority over the practice exhibited deliberate indifference to the problem, thereby effectively ratifying it.

196.    The misconduct described in this Complaint was undertaken pursuant to the policy of the Defendant County and the HCSD in that the County and HCSD had inadequate policies, training, and supervision on the following: the fabrication of evidence or police reports; Hamilton County deputies' obligation to disclose exculpatory and impeachment evidence; the handling, preserving, and disclosure of exculpatory or impeachment evidence; conducting investigations and witness interviews; and writing of police reports or notes; even though the need for such policies, training, and supervision was obvious.

197.    At all times relevant to this Complaint, policymakers for the County and the HCSD knew of these problems, allowed them to continue, and made decisions not to implement adequate policies, training, or supervision.

198.    The constitutional violations complained of by Plaintiff were a highly predictable consequence of a failure to equip Hamilton County sheriff's deputies with the specific tools—including polices, training, and supervision—to handle the recurring situations of how to handle, preserve, and disclose exculpatory or impeachment evidence, how to conduct investigations and witness interviews, and how to write police reports or notes.

199.    The County and HCSD were on notice of a widespread problem with misconduct prior to and after the events described herein. This widespread practice was so well settled as to constitute a *de facto* policy in the Hamilton County Sheriff's Department, and the practice was allowed to exist because municipal policymakers with authority over the practice exhibited deliberate indifference to the problem, effectively ratifying it.

200.    The misconduct described in this Complaint was undertaken pursuant to the policy of the Defendant County and the HCSD in that the County and HCSD decided not to implement any legitimate mechanism for oversight or punishment of deputies who engaged in misconduct of the type complained of herein. This led deputies to believe that they could violate citizens' constitutional rights with impunity.

201.    At all times relevant to this Complaint, policymakers for the County and the HCSD knew of these problems and allowed them to continue, even though the need for a legitimate mechanism for new or different policies, training, oversight, or punishment of deputies was obvious. The constitutional violations complained of by Plaintiff were a highly predictable consequence of the failure to have such mechanisms in place.

202.    The policies and practices of the Defendant County and the HCSD were the moving force behind the misconduct described in this Complaint and the violation of Plaintiff's rights. The widespread practices were so well settled as to constitute *de facto* policy in the HCSD and they were allowed to exist because municipal policymakers with authority over these practices exhibited deliberate indifference to the problems, effectively ratifying them.

203.    In addition, the misconduct described in this Complaint was undertaken pursuant to the policy and practice of the Defendant County and the HCSD in that the violation of Plaintiff's rights was committed by the relevant final policymaker for the County, or the persons to whom final policymaking authority had been delegated.

204.    The Defendant County is liable because the violation of Plaintiff's rights as described in this Complaint was caused by the policies, practices, customs, and/or actions of policymakers for the County.

205. Defendant County and the HCSD's policies and practices for training, supervising, monitoring, and disciplining its deputies, and its code of silence, also caused the Defendants to believe that they could abuse Campbell's rights and cover up what they did—all without fear of discipline.

206. As a matter of policy and practice, municipal policy makers and HCSD supervisors condoned and facilitated a code of silence within the HCSD. In accordance with this code, deputies refused to report, and otherwise lied about, misconduct committed by their colleagues, including the misconduct at issue in this case. Defendant Hamilton County's training, supervisory, and disciplinary practices supported this code of silence, by protecting from discipline deputies who engaged in misconduct and teaching sheriff's deputies that they must abide by the code.

207. As a result of Defendant County's and the HCSD's established practice of failing to track and identify sheriff's deputies who are repeatedly accused of the same kinds of serious misconduct; failing to properly investigate cases in which the police are implicated in fabricating or suppressing evidence, as well as wrongful charges and convictions; failing to discipline deputies accused of this unlawful conduct; and facilitating a code of silence within the HCSD, HCSD deputies came to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences.

208. The Defendant County's and HCSD's failure to train, supervise, and discipline its deputies effectively condones, ratifies and sanctions the kind of misconduct that the Defendants committed against Campbell in this case. Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of Defendant Hamilton County's practices and *de facto* policies, as alleged in this Complaint.

209. Defendant County and officials within the HCSD failed to act to remedy the abuses described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Campbell's ongoing injuries.

210. The policies and practices described in this Complaint were consciously approved by Defendant Hamilton County policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

211. As a direct and proximate result of Defendants' actions, Campbell's constitutional rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth in this Complaint.

### William Campbell's Injuries

212. From the date of his arrest until February 12, 2020, Campbell was incarcerated either at the Hamilton County Justice Center or at a state prison.

213. William Campbell spent over eleven years incarcerated for a crime he did not commit. He was wrongfully deprived of freely living a major portion of his adulthood.

214. Campbell's years of wrongful imprisonment deprived him of all things in life so many of us take for granted.

215. Defendants robbed Campbell of his hopes and dreams. As a result of his wrongful conviction, Campbell spent years locked up behind bars, with the liberties granted to free citizens stripped from him. Defendants destroyed Campbell's life without any warning.

216. Campbell was deprived of the opportunity to maintain meaningful relationships with his children, parents, siblings, other family, and friends.

217.     Campbell suffered the deep pain of being deprived of the opportunity to maintain meaningful relationships with his children as they grew up. He was unable to be an active part of their lives, to support them and to show them he loved them, and to be present for important milestones and events. He was unable to protect and provide safety and refuge for his children in ways that they needed.

218.     Campbell has suffered enormous emotional pain and suffering in the loss of years of his adult life. Campbell was deprived of the ability to share holidays, births, funerals, weddings, and other important life milestones with his loved ones. He was deprived of the opportunity to build a home, a family life, and a career, and to enjoy the basic human experiences and pleasures which are fundamental to liberty and freedom. He was stripped of the fundamental freedom to live one's life as an autonomous human being.

219.     Campbell was deprived of the opportunity to enjoy the financial and general benefits of employment and to plan for a secure future for himself and his family.

220.     Campbell was deprived of the opportunity to seek additional education and job training and to have available to him many avenues to learn and gain experience in the world.

221.     William Campbell must now attempt to make a life for himself without the benefit of years of life experiences and with the burden of his prior imprisonment.

222.     As a result of Defendants' misconduct, Campbell suffered various physical, mental, and emotional injuries in prison and continues to suffer today.

223.     In addition to the severe trauma of wrongful imprisonment and Campbell's loss of liberty, Defendants' misconduct continues to cause Campbell extreme physical and psychological pain and suffering.

224.   As a result of the foregoing, Plaintiff suffered tremendous damage, including physical sickness and injury and emotional damages, all proximately caused by Defendants' misconduct.

**COUNT 1**
**42 U.S.C. § 1983 — Fourth and Fourteenth Amendments: Fabrication of False Evidence against Defendants Shepherd, Viner, and Ralston**

225.   All of the foregoing paragraphs are incorporated as though fully set forth here.

226.   In the manner described more fully above, the Defendants, acting individually, jointly and in conspiracy with each other, fabricated evidence, including without limitation, false police reports, statements, and testimony offered at Plaintiff's trial.

227.   In addition, upon information and belief, the Defendants concealed and/or fabricated additional evidence that is not yet known to Plaintiff.

228.   Defendants knowingly fabricated evidence, and a reasonable likelihood exists that the false evidence affected the decision of the jury.  Defendants' actions violated Plaintiff's right to due process guaranteed by the U.S. Constitution.

229.   The Defendants were acting under color of law and within the scope of their employment when they took these actions.

230.   The Defendants' misconduct directly resulted in the unjust criminal conviction of Plaintiff, thereby denying him his constitutional rights to a fair trial guaranteed by the U.S. Constitution.  Absent this misconduct, there would have been no probable cause for his arrest and continued detention, and the prosecution of Plaintiff could not and would not have been pursued. This misconduct caused Plaintiff to be wrongfully convicted of crimes of which he is innocent.

231.   In the manner described more fully above, the misconduct described in this Count was undertaken pursuant to the policies and practices of the Defendant County and the HCSD.

232.    In the manner described more fully above, the policies and practices of the Defendant County and the HCSD were the moving force behind the misconduct described in this Count and behind the violation of Plaintiff's rights.  The widespread practices were so well settled as to constitute *de facto* policy in the HCSD, and they were allowed to exist because municipal policymakers with authority over the practices exhibited deliberate indifference to the problems, effectively ratifying them.

233.    In addition, the misconduct described in this Count was undertaken pursuant to the policy and practices of the Defendant County and the HCSD in that the violation of Plaintiff's rights described in this Count was committed by the relevant final policymaker for the County, or the persons to whom final policymaking authority had been delegated.

234.    The Defendant County is liable because the violation of Plaintiff's rights as described in this Count was caused by the policies, practices, customs, and/or actions of policymakers for these Defendants.

235.    As a direct and proximate result of the Defendants' actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

236.    Defendants are jointly and severally liable for this conduct.

## COUNT 2
### 42 U.S.C. § 1983 — Fourteenth Amendment: *Brady* Violations against Defendants Shepherd and Viner

237.    All of the foregoing paragraphs are incorporated as though fully set forth here.

238.    In the manner described more fully above, the Defendants, acting individually, jointly, and in conspiracy with each other, destroyed, failed to disclose, and otherwise withheld

and/or suppressed exculpatory information and material from the prosecution, Plaintiff, and Plaintiff's defense counsel, including evidence upon which State witnesses could be impeached.

239.   The Defendants, while acting individually, jointly and in conspiracy with one another, deprived Plaintiff of his constitutional right not to be deprived of his liberty without due process of law.

240.   The Defendants were acting under color of law and within the scope of their employment when they took these actions.

241.   The Defendants' misconduct directly resulted in the unjust criminal conviction of Plaintiff, thereby denying him his constitutional right to a fair trial guaranteed by the U.S. Constitution.   By their actions, the Defendants thereby misled and misdirected the criminal prosecution of Plaintiff.  Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued, and there is a reasonable probability that he would not have been convicted.

242.   Furthermore, in the manner described more fully above, upon information and belief, one or more of the Defendants continued to withhold and/or suppress favorable and exculpatory evidence from prosecutors, Plaintiff, and Plaintiff's defense counsel even after his criminal trial, during sentencing, and during the time that Plaintiff's appellate and post-conviction efforts were pending.

243.   In addition, upon information and belief, the Defendants concealed and/or fabricated additional evidence that is not yet known to Plaintiff.

244.   In the manner described in this Complaint, the misconduct described in this Count was undertaken pursuant to the policies and practices of the Defendant County and the HCSD.

245.   In the manner described more fully above, the policies and practices of the Defendant County and the HCSD were the moving force behind the misconduct described in this

Count and behind the violation of Plaintiff's rights. The widespread practices were so well settled as to constitute *de facto* policy in the HCSD, and they were allowed to exist because municipal policymakers with authority over the practices exhibited deliberate indifference to the problems, effectively ratifying them.

246. In addition, the misconduct described in this Count was undertaken pursuant to the policies and practices of the Defendant County and the HCSD in that the violation of Plaintiff's rights described in this Count was committed by the relevant final policymaker for the County, or the persons to whom final policymaking authority had been delegated.

247. The Defendant County is liable because the violation of Plaintiff's rights as described in this Count was caused by the policies, practices, customs, and/or actions of policymakers for these Defendants.

248. As a direct and proximate result of the Defendants' actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

249. Defendants are jointly and severally liable for this conduct.

**COUNT 3**
**42 U.S.C. § 1983 — Fourth and Fourteenth Amendments: False Arrest**
**against Defendants Shepherd and Viner**

250. All of the foregoing paragraphs are incorporated as though fully set forth here.

251. In the manner described more fully above, the Defendants, acting individually, jointly, and in conspiracy with each other, caused Plaintiff to be unreasonably seized, detained, imprisoned and deprived of his liberty without probable cause to believe that he had committed a crime, in violation of his rights secured by the Fourth and Fourteenth Amendments to the United States Constitution.

252.     In the manner described more fully above, the policies and practices of the Defendant County and the HCSD were the moving force behind the misconduct described in this Count and behind the violation of Plaintiff's rights.  The widespread practices were so well settled as to constitute *de facto* policy in the HCSD, and they were allowed to exist because municipal policymakers with authority over the practices exhibited deliberate indifference to the problems, effectively ratifying them.

253.     In addition, the misconduct described in this Count was undertaken pursuant to the policy and practices of the Defendant County and the HCSD in that the violation of Plaintiff's rights described in this Count was committed by the relevant final policymaker for the County, or the persons to whom final policymaking authority had been delegated.

254.     The Defendant County is liable because the violation of Plaintiff's rights as described in this Count was caused by the policies, practices, customs, and/or actions of policymakers for these Defendants.

255.     As a direct and proximate result of the Defendants' actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

256.     Defendants are jointly and severally liable for this conduct.

## COUNT 4
## 42 U.S.C. § 1983 — Fourth and Fourteenth Amendments: Malicious Prosecution against Defendants Shepherd and Viner

257.     All of the foregoing paragraphs are incorporated as though fully set forth here.

258.     In the manner described more fully above, the Defendants, acting individually, jointly, and in conspiracy with each other, instigated, influenced, or participated in the decision to prosecute Plaintiff, and there was no probable cause for the criminal prosecution.

259.    As a consequence of the criminal prosecution, Plaintiff suffered a deprivation of liberty apart from his initial seizure.

260.    Plaintiff's criminal prosecution was terminated and resolved in his favor.

261.    The Defendants accused Plaintiff of criminal activity knowing those accusations to be without genuine probable cause, and the Defendants made statements to other deputies and/or to prosecutors with the intent of exerting influence to institute and continue the judicial proceedings.

262.    Statements of the Defendants regarding Plaintiff's alleged culpability were made with knowledge that these statements were false and perjured.   In so doing, the Defendants fabricated evidence and withheld exculpatory information.

263.    In the manner described more fully above, the Defendants' misconduct denied Plaintiff his constitutional rights to procedural due process under the Fourteenth Amendment and rights under the Fourth Amendment to be free from continued detention without probable cause. Absent this misconduct, there would have been no probable cause for Plaintiff's continued detention, and the prosecution of Plaintiff could not and would not have been pursued. This misconduct caused Plaintiff to be wrongfully convicted of crimes of which he is innocent.

264.    Furthermore, in the manner described more fully above, the Defendants, acting individually, jointly, and in conspiracy with each other, deliberately engaged in arbitrary and conscience-shocking conduct that contravened fundamental canons of decency and fairness and violated Plaintiff's substantive due process rights under the Fourteenth Amendment.

265.    The Defendants were acting under color of law and within the scope of their employment when they took these actions.

266.    In the manner described more fully above, the misconduct described in this Count was undertaken pursuant to the policies and practices of the Defendant County and the HCSD.

267.    In the manner described more fully above, the policies and practices of the Defendant County and the HCSD were the moving force behind the misconduct described in this Count and behind the violation of Plaintiff's rights.  The widespread practices were so well settled as to constitute *de facto* policy in the HCSD, and they were allowed to exist because municipal policymakers with authority over the practices exhibited deliberate indifference to the problems, effectively ratifying them.

268.    In addition, the misconduct described in this Count was undertaken pursuant to the policy and practices of the Defendant County and the HCSD in that the violation of Plaintiff's rights described in this Count was committed by the relevant final policymaker for the County, or the persons to whom final policymaking authority had been delegated.

269.    The Defendant County is liable because the violation of Plaintiff's rights as described in this Count was caused by the policies, practices, customs, and/or actions of policymakers for these Defendants.

270.    As a direct and proximate result of the Defendants' actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

271.    Defendants are jointly and severally liable for this conduct.

## COUNT 5
### 42 U.S.C. § 1983 — Failure to Intervene
### against Defendants Shepherd, Viner, Butler, and John Does 1 through 10

272.    All of the foregoing paragraphs are incorporated as though fully set forth here.

273.     In the manner described more fully above, during the constitutional violations described here, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

274.     The Defendants' actions and omissions in the face of a constitutional duty to intervene were the direct and proximate cause of Plaintiff's constitutional violations and injuries, including but not limited to loss of liberty, physical harm and emotional distress.

275.     The Defendants were acting under color of law and within the scope of their employment when they took these actions.

276.     In the manner described more fully above, the misconduct described in this Count was undertaken pursuant to the policies and practices of the Defendant County and the HCSD.

277.     In the manner described more fully above, the policies and practices of the Defendant County and the HCSD were the moving force behind the misconduct described in this Count and behind the violation of Plaintiff's rights.  The widespread practices were so well settled as to constitute *de facto* policy in the HCSD, and they were allowed to exist because municipal policymakers with authority over the practices exhibited deliberate indifference to the problems, effectively ratifying them.

278.     In addition, the misconduct described in this Count was undertaken pursuant to the policy and practices of the Defendant County and the HCSD in that the violation of Plaintiff's rights described in this Count was committed by the relevant final policymaker for the County, or the persons to whom final policymaking authority had been delegated.

279.     The Defendant County is liable because the violation of Plaintiff's rights as described in this Count was caused by the policies, practices, customs, and/or actions of policymakers for these Defendants.

280.    As a direct and proximate result of the Defendants' actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

281.    Defendants are jointly and severally liable for this conduct.

### COUNT 6
### 42 U.S.C. § 1983 — Supervisory Liability
### against Defendant Butler and John Does 1 through 10

282.    All of the foregoing paragraphs are incorporated as though fully set forth here.

283.    The constitutional injuries complained of here were proximately caused by (i) the intentional misconduct of Butler, John Does 1 through 10, and/or other supervisors, or (ii) by Butler, John Does 1 through 10, and/or other supervisors being deliberately and recklessly indifferent to their subordinates' misconduct, knowing that ignoring that misconduct would necessarily violate Plaintiff's constitutional rights.

284.    Specifically, Defendant Butler, John Does 1 through 10, and/or other supervisors were aware of and facilitated, condoned, and oversaw the unconstitutional measures used by other Defendants to obtain or provide false evidence and suppress exculpatory and impeachment evidence, or Butler, John Does 1 through 10, and/or other supervisors failed to disclose that information or were deliberately, willfully, or recklessly indifferent to their subordinates' unconstitutional tactics.

285.    Defendant Butler, John Does 1 through 10, and/or other supervisors were acting under color of law and within the scope of their employment when they took these actions.

286.    As a direct and proximate result of the actions of Butler, John Does 1 through 10, and/or other supervisors, Plaintiff's constitutional rights were violated and he suffered injuries and

damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

287.     Defendants are jointly and severally liable for this conduct.

### COUNT 7
### 42 U.S.C. § 1983 — Monell Policy and Practice Claim
### against Defendant Hamilton County

288.     All of the foregoing paragraphs are incorporated as though fully set forth here.

289.     Defendant Hamilton County is liable for the violations of Plaintiff's constitutional rights as described in this Complaint by virtue of its official policies and practices.

290.     The actions of the Defendants were undertaken pursuant to policies, practices, and customs of the Defendant County and HCSD, which were approved, encouraged, and/or ratified by policymakers for the Defendant County and the HCSD with final policymaking authority.

291.     These policies and practices included the failure to adequately train, supervise, monitor, and discipline deputies who engaged in constitutional violations, pursuing wrongful convictions through reliance on profoundly flawed investigations, along with fabricated and suppressed evidence, and the police code of silence as described in this Complaint.

292.     One or more of the policies, practices, and customs described in this Complaint was maintained and implemented by Defendant Hamilton County with deliberate indifference to Plaintiff's constitutional rights and were a moving force behind the violations of those rights.

293.     These widespread practices were so well-settled as to constitute de facto policy in the HCSD, and were allowed to exist because municipal policymakers with authority over the conduct exhibited deliberate indifference to the problems, thereby effectively ratifying them.

294.     Furthermore, the widespread practices described in the preceding paragraphs were allowed to flourish because the Defendant County and the HCSD declined to implement sufficient policies or training as described herein, even though the need for such policies and training was

obvious. The Defendant County and the HCSD also declined to implement any legitimate mechanism for oversight or punishment of deputies who committed such misconduct, thereby leading deputies to believe that they could violate citizens' constitutional rights with impunity.

295.    As a direct and proximate result of the Defendant Hamilton County's actions and inactions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**COUNT 8**
**Ohio State Law — Negligence: Willful, Wanton, and/or Reckless Conduct**
**against Defendants Shepherd, Viner, Butler, John Does 1 through 10, and Ralston**

296.    All of the foregoing paragraphs are incorporated as though fully set forth here.

297.    Defendants failed to exercise due care and acted with malicious purpose, in bad faith, and/or in a wanton or reckless manner, and engaged in willful, wanton, and/or reckless conduct, while engaged in official functions and activities, including but not limited to, investigations, report and statement writing, the fabrication of evidence, *Brady* violations, false arrest, malicious prosecution, the failure to intervene during civil-rights violations, and supervisory liability giving rise to constitutional violations as described in this Complaint.

298.    As a direct and proximate result of Defendants' willful, wanton, and/or reckless conduct, Plaintiff's constitutional rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

299.    Defendants are jointly and severally liable for this conduct.

**PRAYER FOR RELIEF**

300.     Plaintiff William Campbell respectfully requests that this Court enter judgment in his favor and against Defendants Hamilton County, Shepherd, Viner, Butler, John Does 1 through 10, and Ralston, awarding (a) compensatory and consequential damages, costs, and attorneys' fees (including those pursuant to 42 U.S.C. § 1988) against each Defendant, jointly and severally, along (b) with punitive damages against each of the individual Defendants, as well as (c) any other relief this Court deems appropriate.

**JURY TRIAL DEMANDED**

Plaintiff William Campbell hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

*/s/ Jacqueline Greene*
Jacqueline Greene (0092733)
Sarah Gelsomino (0084340)
Alphonse A. Gerhardstein (0032053)
FRIEDMAN GILBERT + GERHARDSTEIN
441 Vine Street, Suite 3400
Cincinnati, Ohio 45202
T: 513-572-4200
F: 216-621-0427
jacqueline@FGGfirm.com
sarah@FGGfirm.com
al@FGGfirm.com

Kort Gatterdam (0040434)
Jeffrey A. Lipps (0005541)
CARPENTER LIPPS & LELAND LLP
280 Plaza, Suite 1300 280
North High Street Columbus, Ohio 43215
T: 614-365-4100
F: 614-365-9145
gatterdam@carpenterlipps.com
lipps@carpenterlipps.com

Dated: June 2, 2022                    *Counsel for Plaintiff William Campbell*